IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JANUS WILHELM o/b/o CL, a minor,      )
                                      )
                Plaintiff,            )
                                      )            CV 05-653-PK
        v.                            )
                                      )
JO ANNE B. BARNHART, Commissioner of Social )      FINDINGS AND
Security,                             )            RECOMMENDATION
                                      )
_____Defendant._____ )

PAPAK, Magistrate Judge:

## INTRODUCTION

        Janus Wilhelm, on behalf of C.L., a minor, brings this action for judicial review of a final

decision of the Commissioner of Social Security denying his application for supplemental security

income (SSI) under Title XVI of the Social Security Act for a closed period.  This court has

jurisdiction under 42 U.S.C. §§ 405(g) and 1383c(3). The Commissioner's final decision should be reversed and remanded for an award of benefits.

## BACKGROUND

C.L. was born June 20, 1988. Tr. 140.[1] He was placed in the temporary custody of the Children's Services Division (CSD) of the Oregon Department of Human Services in 1992 due to incidents of abuse and sexual abuse that occurred at his father's home. Tr. 124-128. C.L. remained living with his mother, Janus Wilhelm. The court ordered visitation with C.L.'s father be supervised. Tr. 128, 424, 561-565. Ms. Wilhelm obtained ongoing restraining orders against the father of C.L. due to a history of domestic violence, stalking and harassment. Tr. 275, 567. C.L. was diagnosed with Post Traumatic Stress Disorder (PTSD), Obsessive Compulsive Disorder (OCD), Major Depression, Recurrent, Moderate to Severe, Intrusion in Cognitive Functioning Episodically Because of Stress Factors, and Panic Disorder with Mild Agoraphobia. Tr. 323, 425, 680, 714. C.L. had school absences of 34-67 days during each academic year and had periods of home schooling during the closed period. Tr. 133, 240, 608, 620.

Ms. Wilhelm protectively filed an application for SSI on behalf of C.L. on April 3, 1997. The application was denied and an administrative hearing was held on December 14, 1999. The Administrative Law Judge (ALJ) issued an opinion on January 28, 2000 finding C.L. not disabled and he appealed to this court. On January 25, 2002, the court reversed and remanded his case to the Commissioner for further proceedings. Another administrative hearing was held on July 8, 2004. C.L. requested dismissal of a second claim filed during the pendency of these proceedings and

---

[1] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed with the Commissioner's Answer (docket # 9).

amended the first application for a closed period of disability from April 3, 1997 to September, 1,

2001.  The ALJ issued an opinion on January 7, 2005 and found C.L. was not disabled, which is the

final decision of the Commissioner.

## DISABILITY ANALYSIS

The initial burden of proof rests upon the claimant to establish disability.  *Roberts v. Shalala*,

66 F.3d 179, 182 (9th Cir. 1995).  An individual under the age of 18 who is applying for SSI must

have a "medically determinable physical of mental impairment, which results in marked and severe

functional limitations, and which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I).

The Commissioner has established a three-step sequential process for determining whether

a child is eligible for SSI.  20 C.F.R. § 416.924.  At step one, the Commissioner determines whether

the child is engaged in substantial gainful activity (SGA).  20 C.F.R. § 416.924(b).  At step two, the

Commissioner determines whether the child has a medically severe impairment or combination of

impairments.  An impairment is severe if it causes more than "minimal functional limitations."  20

C.F.R. § 416.924 ©).  Step three requires the Commissioner to determine whether the impairment

"meets or medically equals in severity the set of criteria for an impairment in the listings, or if it

functionally equals the listings."  20 C.F.R. § 416.924(d);  *see,* Listing of Impairments, 20 C.F.R.

Pt. 404, subpt. P, app. 1.;  *see also Merrill ex rel. Merrill v. Apfel*, 224 F.3d 1083, 1085 (9th Cir.

2000).  A child's functional limitations will be evaluated in the following six domains: (1) acquiring

and using information; (2) attending and completing tasks; (3) interacting and relating with others;

(4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-

being.  20 C.F.R. § 416.926a(b)(1)(I)-(vi).  A medically determinable impairment or combination

of impairments will functionally equal a listed impairment if it results in "marked" limitations in two of these domains, or if it results in an "extreme" limitation in one of these domains. 20 C.F.R. § 416.926a. A "marked" limitation is a limitation that seriously interferes with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2). An "extreme" limitation is a limitation that very seriously interferes with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3). If this equivalency test is met and the statutory duration requirement is satisfied, the child will be found disabled. 20 C.F.R. § 416.924(d)(1). C.L. challenges the ALJ's step three determination.

## THE ALJ's FINDINGS

The ALJ found C.L. had not engaged in substantial gainful activity and had severe impairments, PTSD with obsessive compulsive traits and Major Depressive Disorder. Tr. 436, 443, 444. At step three, the ALJ determined C.L.'s severe impairments did not meet the Listing of Impairments in 20 C.F.R. Pt. 404, subpt. P, app. 1. In determining whether the impairments equal the criteria for a listing, he found "the only area of 'marked limitation' is in the area of interacting and relating with others, with less than marked limitations in attending and completing tasks." Tr. 441. The ALJ made the same determination in his previous opinion. Tr. 17, 21. In making his second determination, the ALJ cited the medical expert (ME) who testified at the July 8, 2004 hearing and noted:

> The record continues to demonstrate that claimant did not appear to lack the 'ability' to concentrate from a clinical perspective. While his level of concentration might have waxed and waned depending on his interest in a particular subject or activity, it was related to non-pathological factors, including motivation and environment. . . . While there is conflicting evidence regarding the particulars or details, it is clear that there is some level of trauma associated with abuse. Indeed, Dr. Dragovich has confirmed that much of the claimant's problems could easily be related to the stressors of the difficulties between his parents, which could be 'enormous' at times.

4 - FINDINGS AND RECOMMENDATION

> This supports the conclusion that his problems are significantly 'environmental' and
> not 'pathological.'

Tr. 444.  The ALJ further noted that one of the examining psychologists had recommended medications for the anxiety disorders experienced by C.L.  "In light of that, even if there had been 'marked' concentration deficits, it would not necessarily establish 'disability,' due to the mother's apparent failure to follow  prescribed medical treatment."  *Id.*  The ALJ concluded C.L. was not disabled within the meaning of the Act at any time from April 3, 1997 to September 1, 2001.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record.  42 U.S.C. § 405(g); *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision must be upheld, even if the evidence is susceptible to more than one rational interpretation.  *Andrews v. Shalala*, 53 F.3d at 1039-1040.  However, if a district court remands a case with instructions, the Commissioner may not ignore the court's order.  "Deviation from the court's remand order in the subsequent administrative proceedings is itself legal error subject to reversal on further judicial review." *Sullivan v. Hudson,* 490 U.S. 877, 886 (1989).

## DISCUSSION

C.L. asserts the ALJ erred by failing to comply with the remand order of this court.  This court previously found the ALJ improperly rejected the testimony of Bruce Fairman, Ray Burleigh, and Cheyenne Fitzpatrick.  Tr.  536-537.  C.L. further asserts the ALJ failed to give adequate reasons for rejecting the opinion of Dr. Richardson, a treating psychologist, that C.L. had marked limitations in concentration.  As noted above, in order to meet the disability requirements for childhood SSI in this case, there must be two areas of marked functional limitations.  There is no disagreement regarding C.L.'s marked limitation in social functioning (interacting and relating with others).  The issue is whether there was also marked limitation in concentration (attending and completing tasks) during the closed  period.

## I.    Medical and Educational Evidence

During the 1996-1997 school year, C.L. missed 55 days of school.  Tr.  133.  Janus Wilhelm completed an SSA Function Report for ages 6-12 as part of C.L.'s 1997 SSI application.  She indicated C.L. had concentration problems, nightmares, impaired memory, PTSD symptoms, trust issues, an aversion to germs, and physical ailments.  Tr.  151-160.  C.L.'s sister, Cheyenne Fitzpatrick, also completed an SSA Function Report.  She described C.L.'s social isolation and "tuning out" other people, particularly in school.  Ms. Fitzpatrick stated C.L. was intelligent "but his inability to focus, communicate, or listen , etc. makes school very painful and difficult for him."  Tr. 146.  An SSA Teacher questionnaire was completed by Sharon Gonzalez on September 8, 1997.  She was C.L.'s third grade teacher and noted she did not know C.L. very well due to his poor attendance.  Ms. Gonzalez stated C.L. had no IEP and was behind in achievement, but not in ability to achieve.  She noted he did not relate to peers, was shy and had very little contact with other children.  She believed his problems were due to poor attendance.  Tr. 191-195.

On August 13, 1997, Bruce Fairman, M.S., L.P.C.,  wrote to the state agency regarding his treatment of C.L.  Mr. Fairman is a nationally certified school psychologist and is certified in both Oregon and Washington.  Mr. Fairman provided therapy to C.L. in 1992 when C.L. began reporting sexual and physical abuse.  Although he continued to provide therapy on an intermittent basis, Mr. Fairman conducted his first psychological testing of C.L. in May, 1997.  He administered the Clinician-Administered PTSD Scale for DSM-IV (CAPS) and determined  C.L. had severe PTSD with a GAF of 55.[2]  Tr. 323.  Mr. Fairman noted that C.L.'s understanding and memory are impaired due to "difficulty focusing."  He described the stalking by C.L.'s father which caused C.L. to have constant thoughts regarding the safety of his mother, sister, and himself.  *Id.*  Mr. Fairman noted further:

> It is clear to me that (C.L.) suffers from the anxiety disorder Post-traumatic Stress Disorder, to the extent that it severely impairs his ability to function in the home, school and social arenas.  This disability has grown more and more severe during the last three years.  It shows no signs of abating at this time without a serious intervention and a sense by C.L. of some stability and safety.

Tr. 324.  Mr. Fairman's treatment plan notes for C.L. from November 1997 indicate a GAF of 50, with his highest GAF within the year of 55.  Tr. 328.  In a letter on May 4, 1998, he noted an

---

[2]The GAF is a scale from 1-100, in ten point increments, that is used by clinicians to determine the individual's overall functioning. GAF of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers) The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. 2000).

additional diagnosis of Generalized Anxiety Disorder with a GAF of 45.[3]  Mr. Fairman also stated

he was stalked by C.L.'s father after providing testimony in a court proceeding.  Tr. 315.

Dr. Kim Golletz, a state agency consultant, examined C.L. on August 21, 1997.  She

diagnosed Generalized Anxiety Disorder, rule out PTSD, with a GAF of 45.  Dr. Golletz was

concerned with C.L.'s "perceptual distortions (seeing germs and ghosts)."  She recommended

therapy focused on dealing with his "current, ongoing stressors" such as stalking and his over

dependence on his mother.  Dr. Golletz noted C.L. reported he was "terrified all the time," feels he

is being watched, and believed he had seen his father hiding in the bushes.  Tr. 274-278.  On

September 11, 1997, the state agency consultants reviewing C.L.'s claim determined he had marked

limits in social functioning and less than marked limits in concentration.  Tr. 196-197.  C.L. was

assessed by the Lincoln County Department of Human Services in November, 1997 due to suicidal

thoughts, anger, and homicidal thoughts toward peers and the half-brother who sexually assaulted

him.  A diagnosis of PTSD was assessed and C.L. was referred back to Mr. Fairman for treatment.

Tr. 280-284.

The Waldport Elementary School developed an SST Action Plan for C.L. in January, 1998,

when C.L. was in the fourth grade.  Under "Areas of Concern" in the plan it was noted "PTSD may

be contributing to (C.L.'s) problems in reading - he can't stick with it and can't focus."  The other

area of concern noted was "has trouble when it is not quiet - easily distracted by noise."  Tr. 226.

C.L. missed 28 days of school by January 28, 1998 "due to illness and/or sleep disorders."  Tr. 227.

---

[3]A GAF of 41 to 50 indicates serious symptoms (suicidal ideation, severe obsessional
rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school
functioning (e.g., few friends, unable to keep a job).  The American Psychiatric Association,
Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. 2000).

He had 67 days of absence for the school year. Tr. 608. An SSA Teacher Questionnaire completed by his fourth grade teacher in June of 1998 noted his "only problem is attendance." Tr. 231.

Ray Burleigh wrote a letter in January 1999 stating he was a child and family therapist at the Olalla Center and volunteered at the Children's Advocacy Center doing group therapy with sexually abused boys. C.L. participated in Mr. Burleigh's group in 1998. Mr. Burleigh stated C.L. was a child with serious problems and his therapy notes indicate C.L. was impulsive, worried by germs and would not use a public toilet. He also noted C.L. alternated between aggression and low confidence with other children. Tr. 330-351. Dr. Bazil Freedman, a state agency consultant, conducted a psychological evaluation of C.L. on November 4, 1999. He diagnosed Obsessive Compulsive Disorder (OCD)[4] and PTSD with a GAF of 54. Dr. Freedman suggested medications to help with C.L.'s anxiety disorders. Tr. 423-425.

C. L.'s fifth grade teacher, Ruth McDonald, completed an SSA Teacher Questionnaire on June 1, 1999. Ms. McDonald noted C.L. was "largely off task and unfocused." In addition to his social difficulties, she noted he could only stay on task for five to fifteen minutes and was distracted and bothered by other students. Tr. 235-238. C.L. had 34 absences from school before his withdrawal for home schooling in April. Tr. 240, 608. In a written statement of September, 1999, Ms. McDonald stated that C.L. had deficits in social functioning, attendance, concentration, and processing information. She added that he needed an evaluation for Attention Deficit Disorder. Tr.

---

[4]The Obsessive-Compulsive Disorder is defined as "recurrent obsessions or compulsions that are severe enough to be time consuming (i.e., they take more than one hour a day) or cause marked distress or significant impairment." The obsessive intrusions can be distracting and result in inefficient performance of cognitive tasks that require concentration. The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 456,458 (4th ed. 2000).

243-244.   Kristin Lavy, C.L.'s 6th grade teacher, completed a statement on C.L.'s academic functioning in December of 1999.  She noted C.L.'s "ability to concentrate was affected, and the effect is moderately severe."  Ms. Lavy noted the same difficulty in persistence, pace and focus.  She further noted he had difficulty functioning socially and while mentally capable of functioning at a sixth grade level he was functioning at a lower level.  Tr.  251-257.  However, C.L.'s December, 1999 school progress report noted significant improvement from his previous report.  Tr. 262.  In response to a request from the state agency, the Newport Middle School reported in June, 2001 C.L. was not receiving services through an IEP, there were very few records, and he had very poor attendance.  Tr. 606.  The school responded to another request from the state agency in January 2004, stating C.L.'s attendance was so poor no one had enough knowledge of him to complete the state agency questionnaire.  Tr.  619.

Dr. Rory Richardson began treating C.L. in January 2000 following a referral from Lincoln County Department of Mental Health.  Tr.  686.  Dr. Richardson's initial assessment gave a tentative diagnosis of Depressive Disorder "until a clearer clinical picture can be established."  Tr. 695.  Dr. Richardson's treatment notes for C.L. from February to May of 2000 noted a GAF of 50.  Tr. 687-692.  In July, 2000, Dr. Richardson noted C.L.'s diagnosis was PTSD, his GAF had improved to 59 and C.L. was "discharged" for the summer.  Tr.  686.  Dr. Richardson, as a former treating psychologist, was contacted by the Department of Human Services to conduct an evaluation of C.L. in December of 2000.  At that time C.L. was in seventh grade and home schooled.  Dr. Richardson administered several tests, including the Child Yale-Brown Obsessive/Compulsive Scale, the Devereaux Scale for Mental Disorders, the Mooney Problem Checklist, Junior High Version, the Weschler Intelligence Scale for Children-III, and the Personality Inventory for Youth.  Based on his

testing, Dr. Richardson diagnosed PTSD; Major Depression, Recurrent, Moderate to Severe; Disorder of Written Expression (partially compensated for); Intrusion on Cognitive Functioning Episodically Because of Stress Factors; and a current GAF of 44. He also noted C.L. had somatic manifestations of stress. Tr. 677-680.

Dr. Richardson developed a Treatment Plan for C.L. in January 2001. He noted C.L. had a diagnosis of a Cognitive Disorder NOS with difficulty in concentration and focusing, and difficulty with memory and distraction which effected his functioning. Tr. 681. In August, 2001, the state agency conducting the disability determination contracted with Dr. Richardson for an evaluation. Dr. Richardson diagnosed PTSD, OCD, noting it was omitted by mistake from his last report, Major Depressive Disorder, Disorder of Written Expression, and Panic Disorder with mild agoraphobia. He noted C.L.'s level of functioning had actually deteriorated because of increased stress. Dr. Richardson noted C.L.'s condition was likely to continue at least 12 months with a probability of issues intruding into function to adulthood. He noted full remission of the OCD was not likely. Tr. 711-714.

Dr. Richardson wrote to Janus Wilhelm on August 20, 2002 explaining C.L. had "two significant psychiatric conditions," OCD and PTSD, which had previously caused severe limits on C.L.'s functioning. However he noted that by September, 2001, the functional limits were mild to moderate. Dr. Richardson further noted there was no way to predict future intrusions into functioning as C.L. still has significant symptoms, including visual distortions, "auditory distractability," phobias and nightmares. Tr. 749. In June, 2004, the state agency contacted Dr. Richardson for an updated evaluation of C.L. Dr. Richardson's report stated:

> From 1997 to 2001, C.L. had severe problems which interfered with his ability to
> function socially. From the observations and contact this writer had with C.L. during

treatment, his ability to control his attention and distractability was severely impacted by both the Obsessive Compulsive Disorder as well as from issues relating to the past trauma.  His own internal thoughts repeatedly got in the way of consistent follow-through.  If something caused him anxiety, he would react with avoidance and become preoccupied in a task which would consume his thoughts for an extensive period of time.  He has had and continues to have difficulty with controlling the focus, although it has become better with age.

Tr.  768-769.  Dr. Richardson retested C.L. and diagnosed PTSD, OCD, Mood Disorder NOS (with psychotic features) and a GAF of 49.  Tr.  774.  Dr. Richardson also noted that it was unclear if his conditions could be stabilized with medication.  *Id.*

C.L. testified at the hearing on July 8, 2004, when he was 16 years old.  He stated his concentration and focus had improved since the last hearing after receiving therapy from Dr. Richardson.  Tr. 786.  C.L. also testified that he did not remember his previous therapists, Mr. Fairman and Mr. Burleigh.  Tr. 788.

## II.    Lay Witness Testimony

As discussed above, the disputed issue in this case is whether C.L. has a marked limitation in the functional domain of Attending and Completing Tasks, which is the ability to focus and concentrate.[5]  In the 2002 remand order, this court found the ALJ erred in improperly rejecting the

---

[5](h) *Attending and completing tasks.*  In this domain, we consider how well you are able to focus and maintain your attention, and how well you begin, carry through, and finishes your activities, including the pace at which you perform activities and the ease with which you change them.
(1) *General.* (i) Attention involves regulating your levels of alertness and initiating and maintaining concentration.  It involves the ability to filter out distractions and to remain focused on an activity or task at a consistent level of performance.  This means focusing long enough to initiate and complete an activity or task, and changing focus once it is completed.  It also means that if you lose or change your focus in the middle of a task, you are able to return to the task without other people having to remind you frequently to finish it.
(ii)  Adequate attention is needed to maintain physical and mental effort and concentration on an activity or task.  Adequate attention permits you to think and reflect before starting or deciding to stop an activity.  In other words, you are able to look ahead and predict the possible outcomes

opinions of  Mr. Fairman, Mr. Burleigh, and Ms. Fitzpatrick.  Tr. 536-537.  "Friends, family members, and others in a position to observe a claimant's symptoms and daily activities are competent to testify as to the claimant's condition." *Dodrill v. Shalala*, 12 F.3d 915, 918-919 (9th Cir. 1993).  Such testimony cannot be disregarded without comment. *Nguyen v. Chater*, 100 F. 3d 1462, 1467 (9th Cir. 1996).  If the ALJ wishes to discount lay witness testimony, he must give reasons that are germane to the witness. *Dodrill v. Shalala*, 12 F. 3d at 919.

### A.  Mr. Fairman

C.L. asserts the ALJ erred by failing to follow the remand order of this court to fully address Mr. Fairman's opinion regarding C.L.'s difficulties with concentration and focus.  Mr. Fairman was a treating therapist for C.L. after the initial  disclosure of sexual abuse and intermittently thereafter. Tr. 315.  The ALJ's only comment regarding Mr. Fairman's opinion was to cite the testimony of the ME, Dr. Dragovich,  "As previously indicated, she found that Dr. Fairman's report of dropping GAF scores were internally inconsistent." Tr. 443.  There is no other discussion of Mr. Fairman's opinion. At the hearing, Dr. Dragovich testified,

> Q:  And then I show in May of '98 he drops him to a 45 after he's had further contact with this child, Do you see that?  It's 7F-4.
> A:  Yeah.  That's one of the ones that drop to 45.  These are all within - they're internally inconsistent is what I've testified to.
> Q:  Well, I guess I don't understand what you mean by they're internally inconsistent.
> A:  Sometimes when they're saying what was the highest GAF in the last year they're ignoring their own previous higher GAF ratings and rating him lower.

Tr.  802.

---

of your actions before you act.  Focusing your attention allows you to attempt tasks at an appropriate pace.  It also helps you determine the time needed to finish a task within an appropriate time-frame.
20 C.F.R. § 416.926a(h).

The record contains Mr. Fairman's treatment notes from 1997-1998.  Contrary to Dr. Dragovich's testimony, Mr. Fairman's treatment notes do not contain GAF scores which ignore previous higher GAF scores.  Following psychological testing, Mr. Fairman reached a diagnosis of PTSD and a GAF of 55 in May 1997.  The treatment notes from late 1997 to 1998 state the highest previous GAF was 55, with current GAF's ranging from 50 and 55.  Tr.  317-332, 352-360.  In a letter to state agency in May 1998, Mr. Fairman stated C.L. had an additional diagnosis of Generalized Anxiety Disorder with a GAF of 45.  Tr. 315.  The letter does not refer to previous GAF scores, only Mr. Fairman's treatment notes do so.

In the remand order, this court noted that the ALJ apparently accepted Mr. Fairman's opinion regarding C.L.'s "marked impairments in the social arena," and failed to address the part of Mr. Fairman's opinion regarding concentration and focus.  Tr.  536.  The record contains substantial evidence supporting Mr. Fairman's opinions.  Dr. Golletz, the state agency examining psychologist, gave C.L. a GAF of 45 in August, 1997.  C.L. missed 122 days of school in the third and fourth grade, September, 1996-May, 1998.  His third grade teacher noted she did not really know him very well due to his frequent absences.  During fourth grade, in January, 1998, C.L.'s school developed an action plan for him based on his inability to focus and concentrate. Before he withdrew from school in the fifth grade to be home schooled, C.L. had 34 absences.  His fifth grade teacher noted he was off-task most of the time, unfocused and easily distracted.  She recommended an evaluation for Attention Deficit Disorder.  C.L.'s sixth grade teacher also noted severe concentration issues.

While the Commissioner asserts the ALJ's one sentence comment regarding Mr. Fairman is sufficient to comply with the remand order, it clearly is not.  The precise issue in this case is whether C.L. had marked limitations in his ability to focus and concentrate during the closed period.  Mr.

Fairman had a long term therapeutic relationship with C.L. and observed him over a period of several years.  Mr. Fairman stated C.L.'s understanding and memory were impaired due to his difficulty focusing.  He noted C.L. had intrusive thoughts regarding safety.  Tr. 323.  Significantly, Mr. Fairman noted in 1997 that C.L.'s "disability has grown more and more severe during the last three years," to the extent it "severely impairs his ability to function in the home, school and social arenas."  Tr.  324.  The court's remand order specifically stated the ALJ erred by not adequately addressing Mr. Fairman's testimony and the ALJ has repeated this error.

### B.  Mr. Burleigh

C.L. asserts the ALJ erred by not following this court's remand order to properly address the opinion of Mr. Burleigh.  The ALJ once again noted Mr. Burleigh's opinion without comment.  The Commissioner argues the ALJ considered the opinions of Mr. Burleigh and Mr. Fairman and relied on the testimony from Dr. Dragovich that Mr. Fairman's GAF scores were internally inconsistent. (def. brief pg. 13).   However, Mr. Fairman and Mr. Burleigh were not in practice together.  Mr. Burleigh was a family therapist who volunteered at the Children's Advocacy Center by providing group therapy to  abused boys.  The court's remand order specifically stated the ALJ erred by not adequately addressing Mr. Burleigh's testimony and the ALJ has repeated this error.

### C.  Ms. Fitzpatrick

C.L. argues the ALJ did not properly address the testimony of Ms. Fitzpatrick as directed by the remand order of this court.  Ms. Fitzpatrick, who is eleven years older than C.L., testified at the first administrative hearing on December 14, 1999.  She stated she and her mother spent hours working with C.L. on his homework.  Ms. Fitzpatrick testified:

> I personally have sat with him, for something I consider to be a very easy, very appropriate to his age, very appropriate to his intelligence level assignment or

> project, and just had to drag him through it and at the end of several hours, when you would request that C.L. work on that formula or answer this question or recite the definition he's gone over 25 times.  He just, he just has the blankest expression on his face, going, I, I don't know, you know, I don't know.

Tr.  64.  She also testified that C.L. needed constant reminders to do activities around the house, such as caring for pets.  Tr.  80-81.  As noted above, Ms. Fitzpatrick completed a questionnaire for C.L.'s initial SSI application in 1997.  She stated C.L. was unable to focus, communicate or listen appropriately.  Tr.  146.

This court found the ALJ erred in his first opinion by improperly rejecting Ms. Fitzpatrick's opinion.  The ALJ did not address Ms. Fitzpatrick's testimony in his second opinion.  While not directly addressing this omission, the Commissioner asserts Ms. Fitzpatrick's testimony is not sufficient to establish the presence of "marked" concentration deficits.  However, Ms. Fitzpatrick's testimony is supported by the record as a whole.  The school records from the closed period supports Ms. Fitzpatrick's testimony.  The records indicate during his third grade, the 1996-1997 academic year, C.L. had 55 days absent and during fourth grade, the 1997-1998 academic year, 67.5 days absent. It is not surprising that in the third and fourth grade, the years when C.L. had over fifty days of absence, his teachers remarked his main problem was attendance and his third grade teacher noted she did not know him very well due to his frequent absences.  Although his fourth grade teacher believed his main problem was attendance, in January, 1998, C.L.'s school developed an action plan for him based on his inability to focus and concentrate. Tr.  191-195, 228-231.  In fifth grade, the 1998-1999 academic year, C.L. was absent 34.5 days and began home schooling in April of that year.  His fifth grade teacher, Ms. McDonald, noted deficits in social functioning, concentration, attendance, and processing information.  Tr.  243-245.  She stated he was largely "off task," unfocused, and needed an evaluation for attention deficit disorder. *Id,*  Tr. 235-237.  C.L. missed

40.5 days during sixth grade, the 1999-2000 school year.  His sixth grade teacher also noted C.L.'s concentration was significantly affected and he was not functioning at grade level.  Tr. 255-257.  C.L was home schooled for seventh grade, the 2000-2001 school year.  Tr. 133, 240, 620.

The Commissioner asserts C.L.'s testimony in 2004, three years after the closed period, that he still has some difficulty focusing, but has improved, is supportive of less than marked deficits in concentration from 1997 to 2001.  However, C.L.'s testimony instead supports the assertion that his focus and concentration were impaired during the closed period and are now improved.  The ALJ also noted C.L.'s high average IQ and 2.1 grade point average in high school as indicative of his ability to concentrate.  Not only is the grade point average referred to by the ALJ after the closed period, but during the closed period C.L. missed 185 days of school and was home schooled for part of fifth grade and all of seventh grade.  Ms. Fitzpatrick stated  C.L. made up his school deficits with periods of intensive work at home with his mother.  The regulations state that performing in a setting with supports, for example, at home, does not mean a child is not disabled or can do well in regular setting without the supports.  20 C.F.R. § 416.924a(b)(5)(iv).[6]

In addition to the school record, Ms. Fitzpatrick's testimony is also supported by the reports from Mr. Fairman and Mr. Burleigh.  More importantly, Ms. Fitzpatrick's testimony is consistent

---

[6](iv) *Structured or supportive settings.* (A)  If you have a serious impairment(s), you may spend some or all of your time in a structured or supportive setting, beyond what a child who does not have an impairment typically needs.

(B)  A structured or supportive setting may be your own home in which family members or other people . . . make adjustments to accommodate your impairments. . .

(c)  A structured or supportive setting may minimize signs and symptoms of your impairment(s) and help to improve your functioning while you are in it, but your signs, symptoms, and functional limitations may worsen outside this type of setting.  Therefore, we will consider your need for a structured setting and the degree of limitation in functioning you have or would have outside the structured setting. . .   20 C.F.R. § 924a(b)(5)(iv).

with the findings of every examining or treating psychologist, including the state agency examiners, Drs. Golletz, Freedman, and Richardson. The court's remand order specifically stated the ALJ erred by not adequately addressing Ms. Fitzpatrick's testimony and the ALJ has repeated this error.

**III. Dr. Richardson**

C.L. asserts that the ALJ erred by not providing sufficient reasons for rejecting the opinion of Dr. Richardson, a treating and examining psychologist. Dr. Richardson was contacted by the state agency in 2004 to provide a current evaluation of C.L. Dr. Richardson stated in his report that from 1997 to 2001, C.L.'s ability to concentrate was "severely impacted." This assessment is consistent with his treatment records and psychological testing results. Dr. Richardson also noted C.L.'s ability to focus had improved with age. The ALJ does not directly discredit Dr. Richardson's opinion. The ALJ cites the opinion of the ME, stating, "Dr. Dragovich did not disagree with his diagnostic opinions, but she did testify that they did not demonstrate or support an overall markedly impaired level of functioning." Tr. 443.

Dr. Richardson is a treating and examining psychologist. Dr. Dragovich is a reviewing psychologist. Social security regulations specify that the most weight is given to the opinions of treating psychologists, followed by examining psychologists, and the least amount of weight is given to nonexamining experts. *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001). In order to rely on the testimony of Dr. Dragovich, the ALJ must give specific and legitimate reasons based on substantial evidence in the record for discounting Dr. Richardson's opinion. *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). The ALJ noted Dr. Richardson's opinion was not consistent with the school record. However, as discussed above, the record as a whole demonstrates C.L.'s continued

inability to focus and concentrate during the closed period, with achievement occurring only with home schooling and intensive efforts by C.L.'s mother and sister.

While not directly addressing Dr. Richardson's opinion, the ALJ determined C.L.'s limitations were due to "environmental" rather than "pathological" causes, and cites the "enormous stressors" in C.L.'s life. Tr. 444. However, the issue is not what caused C.L.'s limitations, but whether he was functionally limited during the closed period. The ALJ also stated to the extent there were marked concentration problems, these problems would have improved if C.L. had taken the prescription medications suggested by Dr. Freedman. *Id.* Social Security Rulings (SSR) are specific in this matter. In order to find a claimant not disabled due to failure to follow prescribed treatment, the treatment must be prescribed by a treating physician and the ALJ must inquire about the reasons for the refusal. SSR 82-59. Dr. Freedman was an examining, not a treating psychologist. Dr. Richardson, C.L.'s treating psychologist, specifically stated medications might not be successful with C.L. Tr. 774. The ALJ did not question C.L. regarding medications or why he was not taking them.

Dr. Richardson's opinion is consistent with the opinions of the other examining psychologists and the therapists who provided counseling. His opinion is also consistent with substantial evidence in the record, including testimony from C.L.'s family and the school teachers who had the most contact with C.L. The ALJ erred by not providing specific and legitimate reason based on substantial evidence for rejecting Dr. Richardson's opinion.

## III.    Remand

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000),

*cert. denied*, 531 U.S. 1038 (2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is not sufficient to support the Commissioner's decision. *Rodriguez v. Bowen,* 876 F2d 759, 763 (9th Cir 1989).

Improperly rejected evidence should be credited and an immediate award of benefits directed where

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Harman*, 211 F.3d at 1178, citing *Smolen* v. *Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). Of course, the third prong of this test is actually a subpart of the second. *Id.* at 1178 n 7.

The ALJ failed to follow the remand order and provide legally sufficient reasons for rejecting the lay testimony. Failure to follow a remand order is itself legal error. The ALJ also failed to properly address the opinion of Dr. Richardson, a treating psychologist. There are no outstanding issues for a determination of disability. Crediting the improperly rejected evidence requires a finding of disability, which is supported by substantial evidence in the record.

//

//

//

//

//

20 - FINDINGS AND RECOMMENDATION

## RECOMMENDATION

Based on the foregoing findings and conclusions, the Commissioner's final decision should be reversed and remanded for an award of benefits.  A final judgment should be entered pursuant to sentence four of 42 U.S.C. § 405(g).

## SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review.  Objections, if any, are due October 3, 2006.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.  If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.


IT IS SO ORDERED.

DATED this 19th day of September, 2006.


_____/s/ Paul Papak_____
Paul J. Papak
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| JANUS WILHELM o/b/o CL, a minor, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CV 05-653-PK |
| v. | ) | |
| | ) | |
| JO ANNE B. BARNHART, Commissioner of Social | ) | FINDINGS AND |
| Security, | ) | RECOMMENDATION |
| | ) | |
| _____Defendant._____ | ) | |

PAPAK, Magistrate Judge:

## **INTRODUCTION**

Janus Wilhelm, on behalf of C.L., a minor, brings this action for judicial review of a final

decision of the Commissioner of Social Security denying his application for supplemental security

income (SSI) under Title XVI of the Social Security Act for a closed period.  This court has

jurisdiction under 42 U.S.C. §§ 405(g) and 1383c(3). The Commissioner's final decision should be reversed and remanded for an award of benefits.

## **BACKGROUND**

C.L. was born June 20, 1988. Tr. 140.[1] He was placed in the temporary custody of the Children's Services Division (CSD) of the Oregon Department of Human Services in 1992 due to incidents of abuse and sexual abuse that occurred at his father's home. Tr. 124-128. C.L. remained living with his mother, Janus Wilhelm. The court ordered visitation with C.L.'s father be supervised. Tr. 128, 424, 561-565. Ms. Wilhelm obtained ongoing restraining orders against the father of C.L. due to a history of domestic violence, stalking and harassment. Tr. 275, 567. C.L. was diagnosed with Post Traumatic Stress Disorder (PTSD), Obsessive Compulsive Disorder (OCD), Major Depression, Recurrent, Moderate to Severe, Intrusion in Cognitive Functioning Episodically Because of Stress Factors, and Panic Disorder with Mild Agoraphobia. Tr. 323, 425, 680, 714. C.L. had school absences of 34-67 days during each academic year and had periods of home schooling during the closed period. Tr. 133, 240, 608, 620.

Ms. Wilhelm protectively filed an application for SSI on behalf of C.L. on April 3, 1997. The application was denied and an administrative hearing was held on December 14, 1999. The Administrative Law Judge (ALJ) issued an opinion on January 28, 2000 finding C.L. not disabled and he appealed to this court. On January 25, 2002, the court reversed and remanded his case to the Commissioner for further proceedings. Another administrative hearing was held on July 8, 2004. C.L. requested dismissal of a second claim filed during the pendency of these proceedings and

---

[1] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed with the Commissioner's Answer (docket # 9).

amended the first application for a closed period of disability from April 3, 1997 to September, 1, 2001.  The ALJ issued an opinion on January 7, 2005 and found C.L. was not disabled, which is the final decision of the Commissioner.

## DISABILITY ANALYSIS

The initial burden of proof rests upon the claimant to establish disability.  *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995).  An individual under the age of 18 who is applying for SSI must have a "medically determinable physical of mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(I).

The Commissioner has established a three-step sequential process for determining whether a child is eligible for SSI.  20 C.F.R. § 416.924.  At step one, the Commissioner determines whether the child is engaged in substantial gainful activity (SGA).  20 C.F.R. § 416.924(b).  At step two, the Commissioner determines whether the child has a medically severe impairment or combination of impairments.  An impairment is severe if it causes more than "minimal functional limitations."  20 C.F.R. § 416.924 ©).  Step three requires the Commissioner to determine whether the impairment "meets or medically equals in severity the set of criteria for an impairment in the listings, or if it functionally equals the listings."  20 C.F.R. § 416.924(d);  *see,* Listing of Impairments, 20 C.F.R. Pt. 404, subpt. P, app. 1.;  *see also Merrill ex rel. Merrill v. Apfel*, 224 F.3d 1083, 1085 (9th Cir. 2000).  A child's functional limitations will be evaluated in the following six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1)(I)-(vi).  A medically determinable impairment or combination

of impairments will functionally equal a listed impairment if it results in "marked" limitations in two of these domains, or if it results in an "extreme" limitation in one of these domains. 20 C.F.R. § 416.926a. A "marked" limitation is a limitation that seriously interferes with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2). An "extreme" limitation is a limitation that very seriously interferes with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3). If this equivalency test is met and the statutory duration requirement is satisfied, the child will be found disabled. 20 C.F.R. § 416.924(d)(1). C.L. challenges the ALJ's step three determination.

## THE ALJ's FINDINGS

The ALJ found C.L. had not engaged in substantial gainful activity and had severe impairments, PTSD with obsessive compulsive traits and Major Depressive Disorder. Tr. 436, 443, 444. At step three, the ALJ determined C.L.'s severe impairments did not meet the Listing of Impairments in 20 C.F.R. Pt. 404, subpt. P, app. 1. In determining whether the impairments equal the criteria for a listing, he found "the only area of 'marked limitation' is in the area of interacting and relating with others, with less than marked limitations in attending and completing tasks." Tr. 441. The ALJ made the same determination in his previous opinion. Tr. 17, 21. In making his second determination, the ALJ cited the medical expert (ME) who testified at the July 8, 2004 hearing and noted:

> The record continues to demonstrate that claimant did not appear to lack the 'ability' to concentrate from a clinical perspective. While his level of concentration might have waxed and waned depending on his interest in a particular subject or activity, it was related to non-pathological factors, including motivation and environment. . . . While there is conflicting evidence regarding the particulars or details, it is clear that there is some level of trauma associated with abuse. Indeed, Dr. Dragovich has confirmed that much of the claimant's problems could easily be related to the stressors of the difficulties between his parents, which could be 'enormous' at times.

4 - FINDINGS AND RECOMMENDATION

> This supports the conclusion that his problems are significantly 'environmental' and
> not 'pathological.'

Tr. 444.  The ALJ further noted that one of the examining psychologists had recommended medications for the anxiety disorders experienced by C.L.  "In light of that, even if there had been 'marked' concentration deficits, it would not necessarily establish 'disability,' due to the mother's apparent failure to follow  prescribed medical treatment."  *Id.*  The ALJ concluded C.L. was not disabled within the meaning of the Act at any time from April 3, 1997 to September 1, 2001.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record.  42 U.S.C. § 405(g); *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*

The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision must be upheld, even if the evidence is susceptible to more than one rational interpretation.  *Andrews v. Shalala*, 53 F.3d at 1039-1040.  However, if a district court remands a case with instructions, the Commissioner may not ignore the court's order.  "Deviation from the court's remand order in the subsequent administrative proceedings is itself legal error subject to reversal on further judicial review."  *Sullivan v. Hudson,* 490 U.S. 877, 886 (1989).

## DISCUSSION

5 - FINDINGS AND RECOMMENDATION

C.L. asserts the ALJ erred by failing to comply with the remand order of this court.  This court previously found the ALJ improperly rejected the testimony of Bruce Fairman, Ray Burleigh, and Cheyenne Fitzpatrick.  Tr.  536-537.  C.L. further asserts the ALJ failed to give adequate reasons for rejecting the opinion of Dr. Richardson, a treating psychologist, that C.L. had marked limitations in concentration.  As noted above, in order to meet the disability requirements for childhood SSI in this case, there must be two areas of marked functional limitations.  There is no disagreement regarding C.L.'s marked limitation in social functioning (interacting and relating with others).  The issue is whether there was also marked limitation in concentration (attending and completing tasks) during the closed  period.

## I.    Medical and Educational Evidence

During the 1996-1997 school year, C.L. missed 55 days of school.  Tr.  133.  Janus Wilhelm completed an SSA Function Report for ages 6-12 as part of C.L.'s 1997 SSI application.  She indicated C.L. had concentration problems, nightmares, impaired memory, PTSD symptoms, trust issues, an aversion to germs, and physical ailments.  Tr.  151-160.  C.L.'s sister, Cheyenne Fitzpatrick, also completed an SSA Function Report.  She described C.L.'s social isolation and "tuning out" other people, particularly in school.  Ms. Fitzpatrick stated C.L. was intelligent "but his inability to focus, communicate, or listen , etc. makes school very painful and difficult for him."  Tr. 146.  An SSA Teacher questionnaire was completed by Sharon Gonzalez on September 8, 1997.  She was C.L.'s third grade teacher and noted she did not know C.L. very well due to his poor attendance.  Ms. Gonzalez stated C.L. had no IEP and was behind in achievement, but not in ability to achieve.  She noted he did not relate to peers, was shy and had very little contact with other children.  She believed his problems were due to poor attendance.  Tr. 191-195.

On August 13, 1997, Bruce Fairman, M.S., L.P.C.,  wrote to the state agency regarding his treatment of C.L.  Mr. Fairman is a nationally certified school psychologist and is certified in both Oregon and Washington.  Mr. Fairman provided therapy to C.L. in 1992 when C.L. began reporting sexual and physical abuse.  Although he continued to provide therapy on an intermittent basis, Mr. Fairman conducted his first psychological testing of C.L. in May, 1997.  He administered the Clinician-Administered PTSD Scale for DSM-IV (CAPS) and determined  C.L. had severe PTSD with a GAF of 55.[2] Tr. 323.  Mr.  Fairman noted that C.L.'s understanding and memory are impaired due to "difficulty focusing."  He described the stalking by C.L.'s father which caused C.L. to have constant thoughts regarding the safety of his mother, sister, and himself.  *Id.*  Mr. Fairman noted further:

> It is clear to me that (C.L.) suffers from the anxiety disorder Post-traumatic Stress Disorder, to the extent that it severely impairs his ability to function in the home, school and social arenas.  This disability has grown more and more severe during the last three years.  It shows no signs of abating at this time without a serious intervention and a sense by C.L. of some stability and safety.

Tr. 324.  Mr. Fairman's treatment plan notes for C.L. from November 1997 indicate a GAF of 50, with his highest GAF within the year of 55.  Tr. 328.  In a letter on May 4, 1998, he noted an

---

[2]The GAF is a scale from 1-100, in ten point increments, that is used by clinicians to determine the individual's overall functioning. GAF of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers) The American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders,</u> 34 (4th ed. 2000).

7 - FINDINGS AND RECOMMENDATION

additional diagnosis of Generalized Anxiety Disorder with a GAF of 45.[3]  Mr. Fairman also stated

he was stalked by C.L.'s father after providing testimony in a court proceeding.  Tr. 315.

Dr. Kim Golletz, a state agency consultant, examined C.L. on August 21, 1997.  She

diagnosed Generalized Anxiety Disorder, rule out PTSD, with a GAF of 45.  Dr. Golletz was

concerned with C.L.'s "perceptual distortions (seeing germs and ghosts)."  She recommended

therapy focused on dealing with his "current, ongoing  stressors" such as stalking and his over

dependence on his mother.  Dr. Golletz noted C.L. reported he was "terrified all the time," feels he

is being watched, and believed he had seen his father hiding in the bushes.  Tr.  274-278.  On

September 11, 1997, the state agency consultants reviewing C.L.'s claim determined he had marked

limits in social functioning and less than marked limits in concentration.  Tr. 196-197.  C.L. was

assessed by the Lincoln County Department of Human Services in November, 1997 due to suicidal

thoughts, anger, and homicidal thoughts toward peers and the half-brother who sexually assaulted

him.  A diagnosis of PTSD was assessed and C.L. was referred back to Mr. Fairman for treatment.

Tr.  280-284.

The Waldport Elementary School developed an SST Action Plan for C.L. in January, 1998,

when C.L. was in the fourth grade.  Under "Areas of Concern" in the plan it was noted "PTSD may

be contributing to (C.L.'s) problems in reading - he can't stick with it and can't focus."  The other

area of concern noted was "has trouble when it is not quiet - easily distracted by noise."  Tr. 226.

C.L. missed 28 days of school by January 28, 1998 "due to illness and/or sleep disorders."  Tr.  227.

---

[3]A GAF of 41 to 50 indicates serious symptoms (suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job).  The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. 2000).

He had 67 days of absence for the school year.  Tr. 608.  An SSA Teacher Questionnaire completed by his fourth grade teacher in June of 1998 noted his "only problem is attendance."  Tr. 231.

Ray Burleigh wrote a letter in January 1999 stating he was a child and family therapist at the Olalla Center and volunteered at the Children's Advocacy Center doing group therapy with sexually abused boys.  C.L. participated in Mr. Burleigh's group in 1998.  Mr. Burleigh stated C.L. was a child with serious problems and his therapy notes indicate C.L. was impulsive, worried by germs and would not use a public toilet.  He also noted C.L. alternated between aggression and low confidence with other children.  Tr.  330-351.  Dr. Bazil Freedman, a state agency consultant, conducted a psychological evaluation of C.L. on November 4, 1999.  He diagnosed Obsessive Compulsive Disorder (OCD)[4] and PTSD with a GAF of 54.  Dr. Freedman suggested medications to help with C.L.'s anxiety disorders.  Tr.  423-425.

C. L.'s fifth grade teacher, Ruth McDonald, completed an SSA Teacher Questionnaire on June 1, 1999.  Ms. McDonald noted C.L. was  "largely off task and unfocused."  In addition to his social difficulties, she noted he could only stay on task for five to fifteen minutes and was distracted and bothered by other students.  Tr.  235-238.  C.L. had 34 absences from school before his withdrawal for home schooling in April.  Tr.  240, 608.  In a written statement of September, 1999, Ms. McDonald stated that C.L. had deficits in social functioning, attendance, concentration, and processing information.  She added that he needed an evaluation for Attention Deficit Disorder.  Tr.

---

[4]The Obsessive-Compulsive Disorder is defined as "recurrent obsessions or compulsions that are severe enough to be time consuming (i.e., they take more than one hour a day) or cause marked distress or significant impairment." The obsessive intrusions can be distracting and result in inefficient performance of cognitive tasks that require concentration.  The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 456,458 (4th ed. 2000).

243-244.  Kristin Lavy, C.L.'s 6th grade teacher, completed a statement on C.L.'s academic functioning in December of 1999.  She noted C.L.'s "ability to concentrate was affected, and the effect is moderately severe."  Ms. Lavy noted the same difficulty in persistence, pace and focus.  She further noted he had difficulty functioning socially and while mentally capable of functioning at a sixth grade level he was functioning at a lower level.  Tr.  251-257.  However, C.L.'s December, 1999 school progress report noted significant improvement from his previous report.  Tr. 262.  In response to a request from the state agency, the Newport Middle School reported in June, 2001 C.L. was not receiving services through an IEP, there were very few records, and he had very poor attendance.  Tr. 606.  The school responded to another request from the state agency in January 2004, stating C.L.'s attendance was so poor no one had enough knowledge of him to complete the state agency questionnaire.  Tr. 619.

Dr. Rory Richardson began treating C.L. in January 2000 following a referral from Lincoln County Department of Mental Health.  Tr. 686.  Dr. Richardson's initial assessment gave a tentative diagnosis of Depressive Disorder "until a clearer clinical picture can be established."  Tr. 695.  Dr. Richardson's treatment notes for C.L. from February to May of 2000 noted a GAF of 50.  Tr. 687-692.  In July, 2000, Dr. Richardson noted C.L.'s diagnosis was PTSD, his GAF had improved to 59 and C.L. was "discharged" for the summer.  Tr. 686.  Dr. Richardson, as a former treating psychologist, was contacted by the Department of Human Services to conduct an evaluation of C.L. in December of 2000.  At that time C.L. was in seventh grade and home schooled.  Dr. Richardson administered several tests, including the Child Yale-Brown Obsessive/Compulsive Scale, the Devereaux Scale for Mental Disorders, the Mooney Problem Checklist, Junior High Version, the Weschler Intelligence Scale for Children-III, and the Personality Inventory for Youth.  Based on his

testing, Dr. Richardson diagnosed PTSD; Major Depression, Recurrent, Moderate to Severe; Disorder of Written Expression (partially compensated for); Intrusion on Cognitive Functioning Episodically Because of Stress Factors; and a current GAF of 44.  He also noted C.L. had somatic manifestations of stress.  Tr.  677-680.

Dr. Richardson developed a Treatment Plan for C.L. in January 2001.  He noted C.L. had a diagnosis of a Cognitive Disorder NOS with difficulty in concentration and focusing, and difficulty with memory and distraction which effected his functioning.  Tr. 681.  In August, 2001, the state agency conducting the disability determination contracted with Dr. Richardson for an evaluation. Dr. Richardson diagnosed PTSD, OCD, noting it was omitted by mistake from his last report, Major Depressive Disorder, Disorder of Written Expression, and Panic Disorder with mild agoraphobia. He noted C.L.'s level of functioning had actually deteriorated because of increased stress.  Dr. Richardson noted C.L.'s condition was likely to continue at least 12 months  with a probability of issues intruding into function to adulthood.  He noted full remission of the OCD was not likely.  Tr. 711-714.

Dr. Richardson wrote to Janus Wilhelm on August 20, 2002 explaining C.L. had "two significant psychiatric conditions," OCD and PTSD, which had previously caused severe limits on C.L. 's functioning.  However he noted that by September, 2001, the functional limits were mild to moderate.  Dr. Richardson further noted there was no way to predict future intrusions into functioning as C.L. still has significant symptoms, including visual distortions, "auditory distractability," phobias and nightmares.  Tr. 749.  In June, 2004, the state agency contacted Dr. Richardson for an updated evaluation of C.L.  Dr. Richardson's report stated:

> From 1997 to 2001, C.L. had severe problems which interfered with his ability to
> function socially.  From the observations and contact this writer had with C.L. during

treatment, his ability to control his attention and distractability was severely impacted by both the Obsessive Compulsive Disorder as well as from issues relating to the past trauma. His own internal thoughts repeatedly got in the way of consistent follow-through. If something caused him anxiety, he would react with avoidance and become preoccupied in a task which would consume his thoughts for an extensive period of time. He has had and continues to have difficulty with controlling the focus, although it has become better with age.

Tr. 768-769. Dr. Richardson retested C.L. and diagnosed PTSD, OCD, Mood Disorder NOS (with psychotic features) and a GAF of 49. Tr. 774. Dr. Richardson also noted that it was unclear if his conditions could be stabilized with medication. *Id.*

C.L. testified at the hearing on July 8, 2004, when he was 16 years old. He stated his concentration and focus had improved since the last hearing after receiving therapy from Dr. Richardson. Tr. 786. C.L. also testified that he did not remember his previous therapists, Mr. Fairman and Mr. Burleigh. Tr. 788.

## II.    Lay Witness Testimony

As discussed above, the disputed issue in this case is whether C.L. has a marked limitation in the functional domain of Attending and Completing Tasks, which is the ability to focus and concentrate.[5] In the 2002 remand order, this court found the ALJ erred in improperly rejecting the

---

[5](h) *Attending and completing tasks.* In this domain, we consider how well you are able to focus and maintain your attention, and how well you begin, carry through, and finishes your activities, including the pace at which you perform activities and the ease with which you change them.
(1) *General.* (i) Attention involves regulating your levels of alertness and initiating and maintaining concentration. It involves the ability to filter out distractions and to remain focused on an activity or task at a consistent level of performance. This means focusing long enough to initiate and complete an activity or task, and changing focus once it is completed. It also means that if you lose or change your focus in the middle of a task, you are able to return to the task without other people having to remind you frequently to finish it.
(ii) Adequate attention is needed to maintain physical and mental effort and concentration on an activity or task. Adequate attention permits you to think and reflect before starting or deciding to stop an activity. In other words, you are able to look ahead and predict the possible outcomes

opinions of  Mr. Fairman, Mr. Burleigh, and Ms. Fitzpatrick.  Tr. 536-537.  "Friends, family members, and others in a position to observe a claimant's symptoms and daily activities are competent to testify as to the claimant's condition."  *Dodrill v. Shalala*, 12 F.3d 915, 918-919 (9th Cir. 1993).  Such testimony cannot be disregarded without comment.  *Nguyen v. Chater*, 100 F. 3d 1462, 1467 (9th Cir. 1996).  If the ALJ wishes to discount lay witness testimony, he must give reasons that are germane to the witness.  *Dodrill v. Shalala*, 12 F. 3d at 919.

### A.  Mr. Fairman

C.L. asserts the ALJ erred by failing to follow the remand order of this court to fully address Mr. Fairman's opinion regarding C.L.'s difficulties with concentration and focus.  Mr. Fairman was a treating therapist for C.L. after the initial  disclosure of sexual abuse and intermittently thereafter. Tr. 315.  The ALJ's only comment regarding Mr. Fairman's opinion was to cite the testimony of the ME, Dr. Dragovich,  "As previously indicated, she found that Dr. Fairman's report of dropping GAF scores were internally inconsistent." Tr. 443.  There is no other discussion of Mr. Fairman's opinion. At the hearing, Dr. Dragovich testified,

> Q:  And then I show in May of '98 he drops him to a 45 after he's had further contact with this child, Do you see that?  It's 7F-4.
> A:  Yeah.  That's one of the ones that drop to 45.  These are all within - they're internally inconsistent is what I've testified to.
> Q:  Well, I guess I don't understand what you mean by they're internally inconsistent.
> A:  Sometimes when they're saying what was the highest GAF in the last year they're ignoring their own previous higher GAF ratings and rating him lower.

Tr.  802.

———————————————

of your actions before you act.  Focusing your attention allows you to attempt tasks at an appropriate pace.  It also helps you determine the time needed to finish a task within an appropriate time-frame.
20 C.F.R. § 416.926a(h).

13 - FINDINGS AND RECOMMENDATION

The record contains Mr. Fairman's treatment notes from 1997-1998.  Contrary to Dr. Dragovich's testimony, Mr. Fairman's treatment notes do not contain GAF scores which ignore previous higher GAF scores.  Following psychological testing, Mr. Fairman reached a diagnosis of PTSD and a GAF of 55 in May 1997.  The treatment notes from late 1997 to 1998 state the highest previous GAF was 55, with current GAF's ranging from 50 and 55.  Tr.  317-332, 352-360.  In a letter to state agency in May 1998, Mr. Fairman stated C.L. had an additional diagnosis of Generalized Anxiety Disorder with a GAF of 45.  Tr. 315.  The letter does not refer to previous GAF scores, only Mr. Fairman's treatment notes do so.

In the remand order, this court noted that the ALJ apparently accepted Mr. Fairman's opinion regarding C.L.'s "marked impairments in the social arena," and failed to address the part of Mr. Fairman's opinion regarding concentration and focus.  Tr.  536.  The record contains substantial evidence supporting Mr. Fairman's opinions.  Dr. Golletz, the state agency examining psychologist, gave C.L. a GAF of 45 in August, 1997.  C.L. missed 122 days of school in the third and fourth grade, September, 1996-May, 1998.  His third grade teacher noted she did not really know him very well due to his frequent absences.  During fourth grade, in January, 1998, C.L.'s school developed an action plan for him based on his inability to focus and concentrate. Before he withdrew from school in the fifth grade to be home schooled, C.L. had 34 absences.  His fifth grade teacher noted he was off-task most of the time, unfocused and easily distracted.  She recommended an evaluation for Attention Deficit Disorder.  C.L.'s sixth grade teacher also noted severe concentration issues.

While the Commissioner asserts the ALJ's one sentence comment regarding Mr. Fairman is sufficient to comply with the remand order, it clearly is not.  The precise issue in this case is whether C.L. had marked limitations in his ability to focus and concentrate during the closed period.  Mr.

Fairman had a long term therapeutic relationship with C.L. and observed him over a period of several years.  Mr. Fairman stated C.L.'s understanding and memory were impaired due to his difficulty focusing.  He noted C.L. had intrusive thoughts regarding safety.  Tr. 323.  Significantly, Mr. Fairman noted in 1997 that C.L.'s "disability has grown more and more severe during the last three years," to the extent it "severely impairs his ability to function in the home, school and social arenas."  Tr. 324.  The court's remand order specifically stated the ALJ erred by not adequately addressing Mr. Fairman's testimony and the ALJ has repeated this error.

### B.  Mr. Burleigh

C.L. asserts the ALJ erred by not following this court's remand order to properly address the opinion of Mr. Burleigh.  The ALJ once again noted Mr. Burleigh's opinion without comment.  The Commissioner argues the ALJ considered the opinions of Mr. Burleigh and Mr. Fairman and relied on the testimony from Dr. Dragovich that Mr. Fairman's GAF scores were internally inconsistent. (def. brief pg. 13).    However, Mr. Fairman and Mr. Burleigh were not in practice together.  Mr. Burleigh was a family therapist who volunteered at the Children's Advocacy Center by providing group therapy to  abused boys.  The court's remand order specifically stated the ALJ erred by not adequately addressing Mr. Burleigh's testimony and the ALJ has repeated this error.

### C.  Ms. Fitzpatrick

C.L. argues the ALJ did not properly address the testimony of Ms. Fitzpatrick as directed by the remand order of this court.  Ms. Fitzpatrick, who is eleven years older than C.L., testified at the first administrative hearing on December 14, 1999.  She stated she and her mother spent hours working with C.L. on his homework.  Ms. Fitzpatrick testified:

> I personally have sat with him, for something I consider to be a very easy, very appropriate to his age, very appropriate to his intelligence level assignment or

> project, and just had to drag him through it and at the end of several hours, when you would request that C.L. work on that formula or answer this question or recite the definition he's gone over 25 times. He just, he just has the blankest expression on his face, going, I, I don't know, you know, I don't know.

Tr. 64. She also testified that C.L. needed constant reminders to do activities around the house, such as caring for pets. Tr. 80-81. As noted above, Ms. Fitzpatrick completed a questionnaire for C.L.'s initial SSI application in 1997. She stated C.L. was unable to focus, communicate or listen appropriately. Tr. 146.

This court found the ALJ erred in his first opinion by improperly rejecting Ms. Fitzpatrick's opinion. The ALJ did not address Ms. Fitzpatrick's testimony in his second opinion. While not directly addressing this omission, the Commissioner asserts Ms. Fitzpatrick's testimony is not sufficient to establish the presence of "marked" concentration deficits. However, Ms. Fitzpatrick's testimony is supported by the record as a whole. The school records from the closed period supports Ms. Fitzpatrick's testimony. The records indicate during his third grade, the 1996-1997 academic year, C.L. had 55 days absent and during fourth grade, the 1997-1998 academic year, 67.5 days absent. It is not surprising that in the third and fourth grade, the years when C.L. had over fifty days of absence, his teachers remarked his main problem was attendance and his third grade teacher noted she did not know him very well due to his frequent absences. Although his fourth grade teacher believed his main problem was attendance, in January, 1998, C.L.'s school developed an action plan for him based on his inability to focus and concentrate. Tr. 191-195, 228-231. In fifth grade, the 1998-1999 academic year, C.L. was absent 34.5 days and began home schooling in April of that year. His fifth grade teacher, Ms. McDonald, noted deficits in social functioning, concentration, attendance, and processing information. Tr. 243-245. She stated he was largely "off task," unfocused, and needed an evaluation for attention deficit disorder. *Id,* Tr. 235-237. C.L. missed

40.5 days during sixth grade, the 1999-2000 school year.  His sixth grade teacher also noted C.L.'s concentration was significantly affected and he was not functioning at grade level.  Tr. 255-257. C.L was home schooled for seventh grade, the 2000-2001 school year.  Tr. 133, 240, 620.

The Commissioner asserts C.L.'s testimony in 2004, three years after the closed period, that he still has some difficulty focusing, but has improved, is supportive of less than marked deficits in concentration from 1997 to 2001.  However, C.L.'s testimony instead supports the assertion that his focus and concentration were impaired during the closed period and are now improved.  The ALJ also noted C.L.'s high average IQ and 2.1 grade point average in high school as indicative of his ability to concentrate.  Not only is the grade point average referred to by the ALJ after the closed period, but during the closed period C.L. missed 185 days of school and was home schooled for part of fifth grade and all of seventh grade.  Ms. Fitzpatrick stated  C.L. made up his school deficits with periods of intensive work at home with his mother.  The regulations state that performing in a setting with supports, for example, at home, does not mean a child is not disabled or can do well in regular setting without the supports.  20 C.F.R. § 416.924a(b)(5)(iv).[6]

In addition to the school record, Ms. Fitzpatrick's testimony is also supported by the reports from Mr. Fairman and Mr. Burleigh.  More importantly, Ms. Fitzpatrick's testimony is consistent

---

[6](iv) *Structured or supportive settings.* (A)  If you have a serious impairment(s), you may spend some or all of your time in a structured or supportive setting, beyond what a child who does not have an impairment typically needs.
(B)  A structured or supportive setting may be your own home in which family members or other people . . . make adjustments to accommodate your impairments. . .
(c)  A structured or supportive setting may minimize signs and symptoms of your impairment(s) and help to improve your functioning while you are in it, but your signs, symptoms, and functional limitations may worsen outside this type of setting.  Therefore, we will consider your need for a structured setting and the degree of limitation in functioning you have or would have outside the structured setting. . .   20 C.F.R. § 924a(b)(5)(iv).

17 - FINDINGS AND RECOMMENDATION

with the findings of every examining or treating psychologist, including the state agency examiners,

Drs. Golletz, Freedman, and Richardson. The court's remand order specifically stated the ALJ erred

by not adequately addressing Ms. Fitzpatrick's testimony and the ALJ has repeated this error.

### III. Dr. Richardson

C.L. asserts that the ALJ erred by not providing sufficient reasons for rejecting the opinion

of Dr. Richardson, a treating and examining psychologist. Dr. Richardson was contacted by the state

agency in 2004 to provide a current evaluation of C.L. Dr. Richardson stated in his report that from

1997 to 2001, C.L.'s ability to concentrate was "severely impacted." This assessment is consistent

with his treatment records and psychological testing results. Dr. Richardson also noted C.L.'s ability

to focus had improved with age. The ALJ does not directly discredit Dr. Richardson's opinion. The

ALJ cites the opinion of the ME, stating, "Dr. Dragovich did not disagree with his diagnostic

opinions, but she did testify that they did not demonstrate or support an overall markedly impaired

level of functioning." Tr. 443.

Dr. Richardson is a treating and examining psychologist. Dr. Dragovich is a reviewing

psychologist. Social security regulations specify that the most weight is given to the opinions of

treating psychologists, followed by examining psychologists, and the least amount of weight is given

to nonexamining experts. *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001). In order to

rely on the testimony of Dr. Dragovich, the ALJ must give specific and legitimate reasons based on

substantial evidence in the record for discounting Dr. Richardson's opinion. *Reddick v. Chater*, 157

F.3d 715, 725 (9th Cir. 1998). The ALJ noted Dr. Richardson's opinion was not consistent with the

school record. However, as discussed above, the record as a whole demonstrates C.L.'s continued

inability to focus and concentrate during the closed period, with achievement occurring only with home schooling and intensive efforts by C.L.'s mother and sister.

While not directly addressing Dr. Richardson's opinion, the ALJ determined C.L.'s limitations were due to "environmental" rather than "pathological" causes, and cites the "enormous stressors" in C.L.'s life.  Tr.  444.  However, the issue is not what caused C.L.'s limitations, but whether he was functionally limited during the closed period.  The ALJ also stated to the extent there were marked concentration problems, these problems would have improved if C.L. had taken the prescription medications suggested by Dr. Freedman.  *Id.*  Social Security Rulings (SSR) are specific in this matter.  In order to find a claimant not disabled due to failure to follow prescribed treatment, the treatment must be prescribed by a treating physician and the ALJ must inquire about the reasons for the refusal.  SSR 82-59.  Dr. Freedman was an examining, not a treating psychologist.  Dr. Richardson, C.L.'s treating psychologist, specifically stated medications might not be successful with C.L.  Tr.  774.  The ALJ did not question C.L. regarding medications or why he was not taking them.

Dr. Richardson's opinion is consistent with the opinions of the other examining psychologists and the therapists who provided counseling.  His opinion is also consistent with substantial evidence in the record, including testimony from C.L.'s family and the school teachers who had the most contact with C.L.  The ALJ erred by not providing specific and legitimate reason based on substantial evidence for rejecting Dr. Richardson's opinion.

## III.   Remand

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000),

19 - FINDINGS AND RECOMMENDATION

*cert. denied*, 531 U.S. 1038 (2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is not sufficient to support the Commissioner's decision. *Rodriguez v. Bowen,* 876 F2d 759, 763 (9th Cir 1989).

Improperly rejected evidence should be credited and an immediate award of benefits directed where

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Harman*, 211 F.3d at 1178, citing *Smolen* v. *Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). Of course, the third prong of this test is actually a subpart of the second. *Id.* at 1178 n 7.

The ALJ failed to follow the remand order and provide legally sufficient reasons for rejecting the lay testimony. Failure to follow a remand order is itself legal error. The ALJ also failed to properly address the opinion of Dr. Richardson, a treating psychologist. There are no outstanding issues for a determination of disability. Crediting the improperly rejected evidence requires a finding of disability, which is supported by substantial evidence in the record.

//

//

//

//

//

## RECOMMENDATION

Based on the foregoing findings and conclusions, the Commissioner's final decision should be reversed and remanded for an award of benefits.  A final judgment should be entered pursuant to sentence four of 42 U.S.C. § 405(g).

## SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review.  Objections, if any, are due October 3, 2006.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.  If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

IT IS SO ORDERED.

DATED this 19th day of September, 2006.


_____/s/ Paul Papak_____
Paul J. Papak
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| JANUS WILHELM o/b/o CL, a minor, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CV 05-653-PK |
| v. | ) | |
| | ) | |
| JO ANNE B. BARNHART, Commissioner of Social | ) | FINDINGS AND |
| Security, | ) | RECOMMENDATION |
| | ) | |
| Defendant. | ) | |

PAPAK, Magistrate Judge:

## **INTRODUCTION**

Janus Wilhelm, on behalf of C.L., a minor, brings this action for judicial review of a final

decision of the Commissioner of Social Security denying his application for supplemental security

income (SSI) under Title XVI of the Social Security Act for a closed period.  This court has

jurisdiction under 42 U.S.C. §§ 405(g) and 1383c(3).  The Commissioner's final decision should be reversed and remanded for an award of benefits.

## BACKGROUND

C.L. was born June 20, 1988.  Tr.  140.[1]  He was placed in the temporary custody of the Children's Services Division (CSD) of the Oregon Department of Human Services in 1992 due to incidents of abuse and sexual abuse that occurred at his father's home.  Tr.  124-128.  C.L. remained living with his mother, Janus Wilhelm.  The court ordered visitation with C.L.'s father be supervised. Tr. 128, 424, 561-565.  Ms. Wilhelm obtained ongoing restraining orders against the father of C.L. due to a history of domestic violence, stalking and harassment.  Tr. 275, 567.  C.L. was diagnosed with Post Traumatic Stress Disorder (PTSD), Obsessive Compulsive Disorder (OCD), Major Depression, Recurrent, Moderate to Severe, Intrusion in Cognitive Functioning Episodically Because of Stress Factors, and Panic Disorder with Mild Agoraphobia.  Tr.  323, 425, 680, 714. C.L. had school absences of  34-67 days during each academic year and had periods of home schooling during the closed period.  Tr.  133, 240, 608, 620.

Ms. Wilhelm protectively filed an application for SSI on behalf of C.L. on April 3, 1997. The application was denied and an administrative hearing was held on December 14, 1999.  The Administrative Law Judge (ALJ)  issued an opinion on January 28, 2000 finding C.L. not disabled and he appealed to this court.  On January 25, 2002, the court reversed and remanded his case to the Commissioner for further proceedings.  Another administrative hearing was held on July 8, 2004.  C.L. requested dismissal of a second claim filed during the pendency of these proceedings and

---

[1]  Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed with the Commissioner's Answer (docket # 9).

2 - FINDINGS AND RECOMMENDATION

amended the first application for a closed period of disability from April 3, 1997 to September, 1,

2001.  The ALJ issued an opinion on January 7, 2005 and found C.L. was not disabled, which is the

final decision of the Commissioner.

## DISABILITY ANALYSIS

The initial burden of proof rests upon the claimant to establish disability.  *Roberts v. Shalala*,

66 F.3d 179, 182 (9th Cir. 1995).  An individual under the age of 18 who is applying for SSI must

have a "medically determinable physical of mental impairment, which results in marked and severe

functional limitations, and which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(I).

The Commissioner has established a three-step sequential process for determining whether

a child is eligible for SSI.  20 C.F.R. § 416.924.  At step one, the Commissioner determines whether

the child is engaged in substantial gainful activity (SGA).  20 C.F.R. § 416.924(b).  At step two, the

Commissioner determines whether the child has a medically severe impairment or combination of

impairments.  An impairment is severe if it causes more than "minimal functional limitations."  20

C.F.R. § 416.924 ©).  Step three requires the Commissioner to determine whether the impairment

"meets or medically equals in severity the set of criteria for an impairment in the listings, or if it

functionally equals the listings."  20 C.F.R. § 416.924(d);  *see,* Listing of Impairments, 20 C.F.R.

Pt. 404, subpt. P, app. 1.;  *see also Merrill ex rel. Merrill v. Apfel*, 224 F.3d 1083, 1085 (9th Cir.

2000).  A child's functional limitations will be evaluated in the following six domains: (1) acquiring

and using information; (2) attending and completing tasks; (3) interacting and relating with others;

(4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-

being.  20 C.F.R. § 416.926a(b)(1)(I)-(vi).  A medically determinable impairment or combination

of impairments will functionally equal a listed impairment if it results in "marked" limitations in two of these domains, or if it results in an "extreme" limitation in one of these domains. 20 C.F.R. § 416.926a. A "marked" limitation is a limitation that seriously interferes with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2). An "extreme" limitation is a limitation that very seriously interferes with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3). If this equivalency test is met and the statutory duration requirement is satisfied, the child will be found disabled. 20 C.F.R. § 416.924(d)(1). C.L. challenges the ALJ's step three determination.

## THE ALJ's FINDINGS

The ALJ found C.L. had not engaged in substantial gainful activity and had severe impairments, PTSD with obsessive compulsive traits and Major Depressive Disorder. Tr. 436, 443, 444. At step three, the ALJ determined C.L.'s severe impairments did not meet the Listing of Impairments in 20 C.F.R. Pt. 404, subpt. P, app. 1. In determining whether the impairments equal the criteria for a listing, he found "the only area of 'marked limitation' is in the area of interacting and relating with others, with less than marked limitations in attending and completing tasks." Tr. 441. The ALJ made the same determination in his previous opinion. Tr. 17, 21. In making his second determination, the ALJ cited the medical expert (ME) who testified at the July 8, 2004 hearing and noted:

> The record continues to demonstrate that claimant did not appear to lack the 'ability' to concentrate from a clinical perspective. While his level of concentration might have waxed and waned depending on his interest in a particular subject or activity, it was related to non-pathological factors, including motivation and environment. . . . While there is conflicting evidence regarding the particulars or details, it is clear that there is some level of trauma associated with abuse. Indeed, Dr. Dragovich has confirmed that much of the claimant's problems could easily be related to the stressors of the difficulties between his parents, which could be 'enormous' at times.

4 - FINDINGS AND RECOMMENDATION

> This supports the conclusion that his problems are significantly 'environmental' and
> not 'pathological.'

Tr. 444.  The ALJ further noted that one of the examining psychologists had recommended medications for the anxiety disorders experienced by C.L.  "In light of that, even if there had been 'marked' concentration deficits, it would not necessarily establish 'disability,' due to the mother's apparent failure to follow  prescribed medical treatment."  *Id.*  The ALJ concluded C.L. was not disabled within the meaning of the Act at any time from April 3, 1997 to September 1, 2001.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record.  42 U.S.C. § 405(g); *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*

The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision must be upheld, even if the evidence is susceptible to more than one rational interpretation.  *Andrews v. Shalala*, 53 F.3d at 1039-1040.  However, if a district court remands a case with instructions, the Commissioner may not ignore the court's order.  "Deviation from the court's remand order in the subsequent administrative proceedings is itself legal error subject to reversal on further judicial review."  *Sullivan v. Hudson,* 490 U.S. 877, 886 (1989).

## DISCUSSION

C.L. asserts the ALJ erred by failing to comply with the remand order of this court.  This court previously found the ALJ improperly rejected the testimony of Bruce Fairman, Ray Burleigh, and Cheyenne Fitzpatrick.  Tr.  536-537.  C.L. further asserts the ALJ failed to give adequate reasons for rejecting the opinion of Dr. Richardson, a treating psychologist, that C.L. had marked limitations in concentration.  As noted above, in order to meet the disability requirements for childhood SSI in this case, there must be two areas of marked functional limitations.  There is no disagreement regarding C.L.'s marked limitation in social functioning (interacting and relating with others).  The issue is whether there was also marked limitation in concentration (attending and completing tasks) during the closed  period.

## I.    Medical and Educational Evidence

During the 1996-1997 school year, C.L. missed 55 days of school.  Tr.  133.  Janus Wilhelm completed an SSA Function Report for ages 6-12 as part of C.L.'s 1997 SSI application.  She indicated C.L. had concentration problems, nightmares, impaired memory, PTSD symptoms, trust issues, an aversion to germs, and physical ailments.  Tr.  151-160.  C.L.'s sister, Cheyenne Fitzpatrick, also completed an SSA Function Report.  She described C.L.'s social isolation and "tuning out" other people, particularly in school.  Ms. Fitzpatrick stated C.L. was intelligent "but his inability to focus, communicate, or listen , etc. makes school very painful and difficult for him."  Tr.  146.  An SSA Teacher questionnaire was completed by Sharon Gonzalez on September 8, 1997.  She was C.L.'s third grade teacher and noted she did not know C.L. very well due to his poor attendance.  Ms. Gonzalez stated C.L. had no IEP and was behind in achievement, but not in ability to achieve.  She noted he did not relate to peers, was shy and had very little contact with other children.  She believed his problems were due to poor attendance.  Tr.  191-195.

On August 13, 1997, Bruce Fairman, M.S., L.P.C., wrote to the state agency regarding his treatment of C.L. Mr. Fairman is a nationally certified school psychologist and is certified in both Oregon and Washington. Mr. Fairman provided therapy to C.L. in 1992 when C.L. began reporting sexual and physical abuse. Although he continued to provide therapy on an intermittent basis, Mr. Fairman conducted his first psychological testing of C.L. in May, 1997. He administered the Clinician-Administered PTSD Scale for DSM-IV (CAPS) and determined C.L. had severe PTSD with a GAF of 55.[2] Tr. 323. Mr. Fairman noted that C.L.'s understanding and memory are impaired due to "difficulty focusing." He described the stalking by C.L.'s father which caused C.L. to have constant thoughts regarding the safety of his mother, sister, and himself. *Id.* Mr. Fairman noted further:

> It is clear to me that (C.L.) suffers from the anxiety disorder Post-traumatic Stress Disorder, to the extent that it severely impairs his ability to function in the home, school and social arenas. This disability has grown more and more severe during the last three years. It shows no signs of abating at this time without a serious intervention and a sense by C.L. of some stability and safety.

Tr. 324. Mr. Fairman's treatment plan notes for C.L. from November 1997 indicate a GAF of 50, with his highest GAF within the year of 55. Tr. 328. In a letter on May 4, 1998, he noted an

---

[2]The GAF is a scale from 1-100, in ten point increments, that is used by clinicians to determine the individual's overall functioning. GAF of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers) The American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 34 (4th ed. 2000).

additional diagnosis of Generalized Anxiety Disorder with a GAF of 45.[3]  Mr. Fairman also stated

he was stalked by C.L.'s father after providing testimony in a court proceeding.  Tr. 315.

Dr. Kim Golletz, a state agency consultant, examined C.L. on August 21, 1997.  She

diagnosed Generalized Anxiety Disorder, rule out PTSD, with a GAF of 45.  Dr. Golletz was

concerned with C.L.'s "perceptual distortions (seeing germs and ghosts)."  She recommended

therapy focused on dealing with his "current, ongoing  stressors" such as stalking and his over

dependence on his mother.  Dr. Golletz noted C.L. reported he was "terrified all the time," feels he

is being watched, and believed he had seen his father hiding in the bushes.  Tr.  274-278.  On

September 11, 1997, the state agency consultants reviewing C.L.'s claim determined he had marked

limits in social functioning and less than marked limits in concentration.  Tr. 196-197.  C.L. was

assessed by the Lincoln County Department of Human Services in November, 1997 due to suicidal

thoughts, anger, and homicidal thoughts toward peers and the half-brother who sexually assaulted

him.  A diagnosis of PTSD was assessed and C.L. was referred back to Mr. Fairman for treatment.

Tr.  280-284.

The Waldport Elementary School developed an SST Action Plan for C.L. in January, 1998,

when C.L. was in the fourth grade.  Under "Areas of Concern" in the plan it was noted "PTSD may

be contributing to (C.L.'s) problems in reading - he can't stick with it and can't focus."  The other

area of concern noted was "has trouble when it is not quiet - easily distracted by noise."  Tr. 226.

C.L.  missed 28 days of school by January 28, 1998 "due to illness and/or sleep disorders." Tr.  227.

---

[3]A GAF of 41 to 50 indicates serious symptoms (suicidal ideation, severe obsessional
rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school
functioning (e.g., few friends, unable to keep a job).  The American Psychiatric Association,
Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. 2000).

He had 67 days of absence for the school year. Tr. 608. An SSA Teacher Questionnaire completed by his fourth grade teacher in June of 1998 noted his "only problem is attendance." Tr. 231.

Ray Burleigh wrote a letter in January 1999 stating he was a child and family therapist at the Olalla Center and volunteered at the Children's Advocacy Center doing group therapy with sexually abused boys. C.L. participated in Mr. Burleigh's group in 1998. Mr. Burleigh stated C.L. was a child with serious problems and his therapy notes indicate C.L. was impulsive, worried by germs and would not use a public toilet. He also noted C.L. alternated between aggression and low confidence with other children. Tr. 330-351. Dr. Bazil Freedman, a state agency consultant, conducted a psychological evaluation of C.L. on November 4, 1999. He diagnosed Obsessive Compulsive Disorder (OCD)[4] and PTSD with a GAF of 54. Dr. Freedman suggested medications to help with C.L.'s anxiety disorders. Tr. 423-425.

C. L.'s fifth grade teacher, Ruth McDonald, completed an SSA Teacher Questionnaire on June 1, 1999. Ms. McDonald noted C.L. was "largely off task and unfocused." In addition to his social difficulties, she noted he could only stay on task for five to fifteen minutes and was distracted and bothered by other students. Tr. 235-238. C.L. had 34 absences from school before his withdrawal for home schooling in April. Tr. 240, 608. In a written statement of September, 1999, Ms. McDonald stated that C.L. had deficits in social functioning, attendance, concentration, and processing information. She added that he needed an evaluation for Attention Deficit Disorder. Tr.

---

[4]The Obsessive-Compulsive Disorder is defined as "recurrent obsessions or compulsions that are severe enough to be time consuming (i.e., they take more than one hour a day) or cause marked distress or significant impairment." The obsessive intrusions can be distracting and result in inefficient performance of cognitive tasks that require concentration. The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 456,458 (4th ed. 2000).

243-244.   Kristin Lavy, C.L.'s 6th grade teacher, completed a statement on C.L.'s academic functioning in December of 1999.  She noted C.L.'s "ability to concentrate was affected, and the effect is moderately severe."  Ms. Lavy noted the same difficulty in persistence, pace and focus.  She further noted he had difficulty functioning socially and while mentally capable of functioning at a sixth grade level he was functioning at a lower level.  Tr.  251-257.  However, C.L.'s December, 1999 school progress report noted significant improvement from his previous report.  Tr. 262.  In response to a request from the state agency, the Newport Middle School reported in June, 2001 C.L. was not receiving services through an IEP, there were very few records, and he had very poor attendance.  Tr. 606.  The school responded to another request from the state agency in January 2004, stating C.L.'s attendance was so poor no one had enough knowledge of him to complete the state agency questionnaire.  Tr.  619.

Dr. Rory Richardson began treating C.L. in January 2000 following a referral from Lincoln County Department of Mental Health.  Tr.  686.  Dr. Richardson's initial assessment gave a tentative diagnosis of Depressive Disorder "until a clearer clinical picture can be established."  Tr. 695.  Dr. Richardson's treatment notes for C.L. from February to May of 2000 noted a GAF of 50.  Tr. 687-692.  In July, 2000, Dr. Richardson noted C.L.'s diagnosis was PTSD, his GAF had improved to 59 and C.L. was "discharged" for the summer.  Tr.  686.  Dr. Richardson, as a former treating psychologist, was contacted by the Department of Human Services to conduct an evaluation of C.L. in December of 2000.  At that time C.L. was in seventh grade and home schooled.  Dr. Richardson administered several tests, including the Child Yale-Brown Obsessive/Compulsive Scale, the Devereaux Scale for Mental Disorders, the Mooney Problem Checklist, Junior High Version, the Weschler Intelligence Scale for Children-III, and the Personality Inventory for Youth.  Based on his

testing, Dr. Richardson diagnosed PTSD; Major Depression, Recurrent, Moderate to Severe; Disorder of Written Expression (partially compensated for); Intrusion on Cognitive Functioning Episodically Because of Stress Factors; and a current GAF of 44. He also noted C.L. had somatic manifestations of stress. Tr. 677-680.

Dr. Richardson developed a Treatment Plan for C.L. in January 2001. He noted C.L. had a diagnosis of a Cognitive Disorder NOS with difficulty in concentration and focusing, and difficulty with memory and distraction which effected his functioning. Tr. 681. In August, 2001, the state agency conducting the disability determination contracted with Dr. Richardson for an evaluation. Dr. Richardson diagnosed PTSD, OCD, noting it was omitted by mistake from his last report, Major Depressive Disorder, Disorder of Written Expression, and Panic Disorder with mild agoraphobia. He noted C.L.'s level of functioning had actually deteriorated because of increased stress. Dr. Richardson noted C.L.'s condition was likely to continue at least 12 months with a probability of issues intruding into function to adulthood. He noted full remission of the OCD was not likely. Tr. 711-714.

Dr. Richardson wrote to Janus Wilhelm on August 20, 2002 explaining C.L. had "two significant psychiatric conditions," OCD and PTSD, which had previously caused severe limits on C.L. 's functioning. However he noted that by September, 2001, the functional limits were mild to moderate. Dr. Richardson further noted there was no way to predict future intrusions into functioning as C.L. still has significant symptoms, including visual distortions, "auditory distractability," phobias and nightmares. Tr. 749. In June, 2004, the state agency contacted Dr. Richardson for an updated evaluation of C.L. Dr. Richardson's report stated:

> From 1997 to 2001, C.L. had severe problems which interfered with his ability to
> function socially. From the observations and contact this writer had with C.L. during

treatment, his ability to control his attention and distractability was severely impacted by both the Obsessive Compulsive Disorder as well as from issues relating to the past trauma. His own internal thoughts repeatedly got in the way of consistent follow-through. If something caused him anxiety, he would react with avoidance and become preoccupied in a task which would consume his thoughts for an extensive period of time. He has had and continues to have difficulty with controlling the focus, although it has become better with age.

Tr. 768-769. Dr. Richardson retested C.L. and diagnosed PTSD, OCD, Mood Disorder NOS (with psychotic features) and a GAF of 49. Tr. 774. Dr. Richardson also noted that it was unclear if his conditions could be stabilized with medication. *Id.*

C.L. testified at the hearing on July 8, 2004, when he was 16 years old. He stated his concentration and focus had improved since the last hearing after receiving therapy from Dr. Richardson. Tr. 786. C.L. also testified that he did not remember his previous therapists, Mr. Fairman and Mr. Burleigh. Tr. 788.

## II.    Lay Witness Testimony

As discussed above, the disputed issue in this case is whether C.L. has a marked limitation in the functional domain of Attending and Completing Tasks, which is the ability to focus and concentrate.[5] In the 2002 remand order, this court found the ALJ erred in improperly rejecting the

---

[5](h) *Attending and completing tasks.* In this domain, we consider how well you are able to focus and maintain your attention, and how well you begin, carry through, and finishes your activities, including the pace at which you perform activities and the ease with which you change them.
(1) *General.* (i) Attention involves regulating your levels of alertness and initiating and maintaining concentration. It involves the ability to filter out distractions and to remain focused on an activity or task at a consistent level of performance. This means focusing long enough to initiate and complete an activity or task, and changing focus once it is completed. It also means that if you lose or change your focus in the middle of a task, you are able to return to the task without other people having to remind you frequently to finish it.
(ii) Adequate attention is needed to maintain physical and mental effort and concentration on an activity or task. Adequate attention permits you to think and reflect before starting or deciding to stop an activity. In other words, you are able to look ahead and predict the possible outcomes

opinions of  Mr. Fairman, Mr. Burleigh, and Ms. Fitzpatrick.  Tr. 536-537.  "Friends, family members, and others in a position to observe a claimant's symptoms and daily activities are competent to testify as to the claimant's condition." *Dodrill v. Shalala*, 12 F.3d 915, 918-919 (9th Cir. 1993).  Such testimony cannot be disregarded without comment. *Nguyen v. Chater*, 100 F. 3d 1462, 1467 (9th Cir. 1996).  If the ALJ wishes to discount lay witness testimony, he must give reasons that are germane to the witness.  *Dodrill v. Shalala*, 12 F. 3d at 919.

### A.  Mr. Fairman

C.L. asserts the ALJ erred by failing to follow the remand order of this court to fully address Mr. Fairman's opinion regarding C.L.'s difficulties with concentration and focus.  Mr. Fairman was a treating therapist for C.L. after the initial  disclosure of sexual abuse and intermittently thereafter. Tr. 315.  The ALJ's only comment regarding Mr. Fairman's opinion was to cite the testimony of the ME, Dr. Dragovich,  "As previously indicated, she found that Dr. Fairman's report of dropping GAF scores were internally inconsistent." Tr. 443.  There is no other discussion of Mr. Fairman's opinion. At the hearing, Dr. Dragovich testified,

> Q:  And then I show in May of '98 he drops him to a 45 after he's had further contact with this child, Do you see that?  It's 7F-4.
> A:  Yeah.  That's one of the ones that drop to 45.  These are all within - they're internally inconsistent is what I've testified to.
> Q:  Well, I guess I don't understand what you mean by they're internally inconsistent.
> A:  Sometimes when they're saying what was the highest GAF in the last year they're ignoring their own previous higher GAF ratings and rating him lower.

Tr.  802.

_____

of your actions before you act.  Focusing your attention allows you to attempt tasks at an appropriate pace.  It also helps you determine the time needed to finish a task within an appropriate time-frame.
20 C.F.R. § 416.926a(h).

The record contains Mr. Fairman's treatment notes from 1997-1998.  Contrary to Dr. Dragovich's testimony, Mr. Fairman's treatment notes do not contain GAF scores which ignore previous higher GAF scores.  Following psychological testing, Mr. Fairman reached a diagnosis of PTSD and a GAF of 55 in May 1997.  The treatment notes from late 1997 to 1998 state the highest previous GAF was 55, with current GAF's ranging from 50 and 55.  Tr.  317-332, 352-360.  In a letter to state agency in May 1998, Mr. Fairman stated C.L. had an additional diagnosis of Generalized Anxiety Disorder with a GAF of 45.  Tr. 315.  The letter does not refer to previous GAF scores, only Mr. Fairman's treatment notes do so.

In the remand order, this court noted that the ALJ apparently accepted Mr. Fairman's opinion regarding C.L.'s "marked impairments in the social arena," and failed to address the part of Mr. Fairman's opinion regarding concentration and focus.  Tr.  536.  The record contains substantial evidence supporting Mr. Fairman's opinions.  Dr. Golletz, the state agency examining psychologist, gave C.L. a GAF of 45 in August, 1997.  C.L. missed 122 days of school in the third and fourth grade, September, 1996-May, 1998.  His third grade teacher noted she did not really know him very well due to his frequent absences.  During fourth grade, in January, 1998, C.L.'s school developed an action plan for him based on his inability to focus and concentrate. Before he withdrew from school in the fifth grade to be home schooled, C.L. had 34 absences.  His fifth grade teacher noted he was off-task most of the time, unfocused and easily distracted.  She recommended an evaluation for Attention Deficit Disorder.  C.L.'s sixth grade teacher also noted severe concentration issues.

While the Commissioner asserts the ALJ's one sentence comment regarding Mr. Fairman is sufficient to comply with the remand order, it clearly is not.  The precise issue in this case is whether C.L. had marked limitations in his ability to focus and concentrate during the closed period.  Mr.

Fairman had a long term therapeutic relationship with C.L. and observed him over a period of several years.  Mr. Fairman stated C.L.'s understanding and memory were impaired due to his difficulty focusing.  He noted C.L. had intrusive thoughts regarding safety.  Tr. 323.  Significantly, Mr. Fairman noted in 1997 that C.L.'s "disability has grown more and more severe during the last three years," to the extent it "severely impairs his ability to function in the home, school and social arenas."  Tr. 324.  The court's remand order specifically stated the ALJ erred by not adequately addressing Mr. Fairman's testimony and the ALJ has repeated this error.

### B.  Mr. Burleigh

C.L. asserts the ALJ erred by not following this court's remand order to properly address the opinion of Mr. Burleigh.  The ALJ once again noted Mr. Burleigh's opinion without comment.  The Commissioner argues the ALJ considered the opinions of Mr. Burleigh and Mr. Fairman and relied on the testimony from Dr. Dragovich that Mr. Fairman's GAF scores were internally inconsistent. (def. brief pg. 13).    However, Mr. Fairman and Mr. Burleigh were not in practice together.  Mr. Burleigh was a family therapist who volunteered at the Children's Advocacy Center by providing group therapy to  abused boys.  The court's remand order specifically stated the ALJ erred by not adequately addressing Mr. Burleigh's testimony and the ALJ has repeated this error.

### C.  Ms. Fitzpatrick

C.L. argues the ALJ did not properly address the testimony of Ms. Fitzpatrick as directed by the remand order of this court.  Ms. Fitzpatrick, who is eleven years older than C.L., testified at the first administrative hearing on December 14, 1999.  She stated she and her mother spent hours working with C.L. on his homework.  Ms. Fitzpatrick testified:

> I personally have sat with him, for something I consider to be a very easy, very appropriate to his age, very appropriate to his intelligence level assignment or

> project, and just had to drag him through it and at the end of several hours, when you would request that C.L. work on that formula or answer this question or recite the definition he's gone over 25 times.  He just, he just has the blankest expression on his face, going, I, I don't know, you know, I don't know.

Tr.  64.  She also testified that C.L. needed constant reminders to do activities around the house, such as caring for pets.  Tr.  80-81.  As noted above, Ms. Fitzpatrick completed a questionnaire for C.L.'s initial SSI application in 1997.  She stated C.L. was unable to focus, communicate or listen appropriately.  Tr.  146.

This court found the ALJ erred in his first opinion by improperly rejecting Ms. Fitzpatrick's opinion.  The ALJ did not address Ms. Fitzpatrick's testimony in his second opinion.  While not directly addressing this omission, the Commissioner asserts Ms. Fitzpatrick's testimony is not sufficient to establish the presence of "marked" concentration deficits.  However, Ms. Fitzpatrick's testimony is supported by the record as a whole.  The school records from the closed period supports Ms. Fitzpatrick's testimony.  The records indicate during his third grade, the 1996-1997 academic year, C.L. had 55 days absent and during fourth grade, the 1997-1998 academic year, 67.5 days absent. It is not surprising that in the third and fourth grade, the years when C.L. had over fifty days of absence, his teachers remarked his main problem was attendance and his third grade teacher noted she did not know him very well due to his frequent absences.  Although his fourth grade teacher believed his main problem was attendance, in January, 1998, C.L.'s school developed an action plan for him based on his inability to focus and concentrate. Tr.  191-195, 228-231.  In fifth grade, the 1998-1999 academic year, C.L. was absent 34.5 days and began home schooling in April of that year.  His fifth grade teacher, Ms. McDonald, noted deficits in social functioning, concentration, attendance, and processing information.  Tr.  243-245.  She stated he was largely "off task," unfocused, and needed an evaluation for attention deficit disorder.  *Id,* Tr. 235-237.  C.L. missed

40.5 days during sixth grade, the 1999-2000 school year.  His sixth grade teacher also noted C.L.'s

concentration was significantly affected and he was not functioning at grade level.  Tr. 255-257.

C.L was home schooled for seventh grade, the 2000-2001 school year.  Tr. 133, 240, 620.

The Commissioner asserts C.L.'s testimony in 2004, three years after the closed period, that

he still has some difficulty focusing, but has improved, is supportive of less than marked deficits in

concentration from 1997 to 2001.  However, C.L.'s testimony instead supports the assertion that his

focus and concentration were impaired during the closed period and are now improved.  The ALJ

also noted C.L.'s high average IQ and 2.1 grade point average in high school as indicative of his

ability to concentrate.  Not only is the grade point average referred to by the ALJ after the closed

period, but during the closed period C.L. missed 185 days of school and was home schooled for part

of fifth grade and all of seventh grade.  Ms. Fitzpatrick stated  C.L. made up his school deficits with

periods of intensive work at home with his mother.  The regulations state that performing in a setting

with supports, for example, at home, does not mean a child is not disabled or can do well in regular

setting without the supports.  20 C.F.R. § 416.924a(b)(5)(iv).[6]

In addition to the school record, Ms. Fitzpatrick's testimony is also supported by the reports

from Mr. Fairman and Mr. Burleigh.  More importantly, Ms. Fitzpatrick's testimony is consistent

---

[6](iv) *Structured or supportive settings.* (A)  If you have a serious impairment(s), you may
spend some or all of your time in a structured or supportive setting, beyond what a child who
does not have an impairment typically needs.
(B)  A structured or supportive setting may be your own home in which family members or other
people . . . make adjustments to accommodate your impairments. . .
(c)  A structured or supportive setting may minimize signs and symptoms of your impairment(s)
and help to improve your functioning while you are in it, but your signs, symptoms, and
functional limitations may worsen outside this type of setting.  Therefore, we will consider your
need for a structured setting and the degree of limitation in functioning you have or would have
outside the structured setting. . .   20 C.F.R. § 924a(b)(5)(iv).

with the findings of every examining or treating psychologist, including the state agency examiners,

Drs. Golletz, Freedman, and Richardson. The court's remand order specifically stated the ALJ erred

by not adequately addressing Ms. Fitzpatrick's testimony and the ALJ has repeated this error.

## III. Dr. Richardson

C.L. asserts that the ALJ erred by not providing sufficient reasons for rejecting the opinion

of Dr. Richardson, a treating and examining psychologist. Dr. Richardson was contacted by the state

agency in 2004 to provide a current evaluation of C.L. Dr. Richardson stated in his report that from

1997 to 2001, C.L.'s ability to concentrate was "severely impacted." This assessment is consistent

with his treatment records and psychological testing results. Dr. Richardson also noted C.L.'s ability

to focus had improved with age. The ALJ does not directly discredit Dr. Richardson's opinion. The

ALJ cites the opinion of the ME, stating, "Dr. Dragovich did not disagree with his diagnostic

opinions, but she did testify that they did not demonstrate or support an overall markedly impaired

level of functioning." Tr. 443.

Dr. Richardson is a treating and examining psychologist. Dr. Dragovich is a reviewing

psychologist. Social security regulations specify that the most weight is given to the opinions of

treating psychologists, followed by examining psychologists, and the least amount of weight is given

to nonexamining experts. *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001). In order to

rely on the testimony of Dr. Dragovich, the ALJ must give specific and legitimate reasons based on

substantial evidence in the record for discounting Dr. Richardson's opinion. *Reddick v. Chater*, 157

F.3d 715, 725 (9th Cir. 1998). The ALJ noted Dr. Richardson's opinion was not consistent with the

school record. However, as discussed above, the record as a whole demonstrates C.L.'s continued

inability to focus and concentrate during the closed period, with achievement occurring only with home schooling and intensive efforts by C.L.'s mother and sister.

While not directly addressing Dr. Richardson's opinion, the ALJ determined C.L.'s limitations were due to "environmental" rather than "pathological" causes, and cites the "enormous stressors" in C.L.'s life. Tr. 444. However, the issue is not what caused C.L.'s limitations, but whether he was functionally limited during the closed period. The ALJ also stated to the extent there were marked concentration problems, these problems would have improved if C.L. had taken the prescription medications suggested by Dr. Freedman. *Id.* Social Security Rulings (SSR) are specific in this matter. In order to find a claimant not disabled due to failure to follow prescribed treatment, the treatment must be prescribed by a treating physician and the ALJ must inquire about the reasons for the refusal. SSR 82-59. Dr. Freedman was an examining, not a treating psychologist. Dr. Richardson, C.L.'s treating psychologist, specifically stated medications might not be successful with C.L. Tr. 774. The ALJ did not question C.L. regarding medications or why he was not taking them.

Dr. Richardson's opinion is consistent with the opinions of the other examining psychologists and the therapists who provided counseling. His opinion is also consistent with substantial evidence in the record, including testimony from C.L.'s family and the school teachers who had the most contact with C.L. The ALJ erred by not providing specific and legitimate reason based on substantial evidence for rejecting Dr. Richardson's opinion.

## III.   Remand

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000),

*cert. denied*, 531 U.S. 1038 (2000).  The issue turns on the utility of further proceedings.  A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is not sufficient to support the Commissioner's decision.  *Rodriguez v. Bowen,* 876 F2d 759, 763 (9th Cir 1989).

Improperly rejected evidence should be credited and an immediate award of benefits directed where

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Harman*, 211 F.3d at 1178, citing *Smolen* v. *Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996).  Of course, the third prong of this test is actually a subpart of the second.  *Id.* at 1178 n 7.

The ALJ failed to follow the remand order and provide legally sufficient reasons for rejecting the lay testimony.  Failure to follow a remand order is itself legal error.  The ALJ also failed to properly address the opinion of Dr. Richardson, a treating psychologist.  There are no outstanding issues for a determination of disability.  Crediting the improperly rejected evidence requires a finding of disability, which is supported by substantial evidence in the record.

//

//

//

//

//

20 - FINDINGS AND RECOMMENDATION

## RECOMMENDATION

Based on the foregoing findings and conclusions, the Commissioner's final decision should be reversed and remanded for an award of benefits.  A final judgment should be entered pursuant to sentence four of 42 U.S.C. § 405(g).

## SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review.  Objections, if any, are due October 3, 2006.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.  If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.


IT IS SO ORDERED.

DATED this 19th day of September, 2006.


_____/s/ Paul Papak_____
Paul J. Papak
United States Magistrate Judge

21 - FINDINGS AND RECOMMENDATION